# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA

LATREASS ("LISA") BRITTIAN,
individually, and on behalf of all others
similarly situated,

    Plaintiff,

v.

ESA MANAGEMENT, LLC; ESH
HOSPITALITY STRATEGIES LLC; ESH
STRATEGIES FRANCHISE LLC; ESH
STRATEGIES BRANDING LLC; DOE
COMPANIES 1-10; TWC NORCROSS LLC
D/B/A EXTENDED STAY AMERICA
SUITES NORCROSS; THREE WALL
CAPITAL, LLC; and AIMBRIDGE
HOSPITALITY, LLC,

    Defendants.

Civil Action No. 3:22-cv-00663

**JURY TRIAL DEMANDED**

## CORRECTED CLASS ACTION COMPLAINT

Plaintiff Latreass ("Lisa") Brittian, by and through her undersigned counsel, brings this action against Defendants ESA Management, LLC; ESH Hospitality Strategies LLC; ESH Strategies Franchise LLC; ESH Strategies Branding LLC; Doe Companies 1-10; TWC Norcross LLC d/b/a Extended Stay America Suites Norcross; Three Wall Capital, LLC; and Aimbridge Hospitality, LLC (collectively, "Defendants"). Upon personal knowledge of the facts pertaining to herself and on information and belief as to all other matters, Plaintiff alleges as follows:

## NATURE OF THE CASE

1.    Plaintiff brings this class action on behalf of herself and all other similarly situated individuals who prepaid for a reservation at an Extended Stay America hotel, were denied accommodation in the prepaid hotel room, and whose prepayment was not refunded.

1

2.      Extended Stay America guests have the option of guaranteeing a room with a credit card or prepaying for a reservation. If a guest guarantees a room with a credit card, the reservation is cancelable up until 6 pm of the first night of the reservation. Prepaid reservations are nonrefundable.

3.      Extended Stay America hotels utilize a central reservation system. The central reservation system automatically deems a reservation a "no-show" and cancels the reservation if a guest who has not canceled the reservation by 6 pm is not checked in on the first day of the reservation. If the reservation was guaranteed by a credit card, the credit card is charged a no-show fee of one night's stay.

4.      If a guest who has prepaid for a reservation is not checked in on the first day of their prepaid reservation, the reservation system also automatically deems the prepaid reservation a no-show and cancels the reservation. If the guest attempts to check-in to their prepaid hotel room after the reservation system has automatically deemed their reservation a no-show and cancelled the reservation, the guest is denied accommodation at the hotel. Since the prepaid reservation is also nonrefundable, the guest is not refunded the prepaid amount.

5.      Similarly, if the guest is already staying at the hotel and extends their stay by prepaying for another reservation but is not checked-in to the prepaid reservation in the reservation system on the first day of the prepaid reservation, the reservation system automatically deems the reservation a no show and cancels the reservation. The guest is asked to vacate the room and is denied a refund because the prepaid reservation is nonrefundable.

## JURISDICTION AND VENUE

6.      The Extended Stay America Terms & Conditions include a choice of forum clause, providing: "Both parties submit to the personal jurisdiction of and venue in the state and federal courts in the State of North Carolina located in Charlotte, Mecklenburg County, North Carolina.

2

The parties further agree that any cause of action arising under these terms shall exclusively be brought in such courts." Accordingly, Defendants have agreed to submit to personal jurisdiction and venue in this Court.

7.      Attached as **Exhibit 1** is a true and accurate copy of the Extended Stay America Terms & Conditions that were applicable at all relevant times.

8.      The Court also has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1332(d), because: (a) this action is brought as a proposed class action under Fed. R. Civ. P. 23; (b) the proposed Class includes more than 100 members; (c) Plaintiff and Class Members are citizens of states that are diverse from Defendants' domicile; and (d) the matter in controversy exceeds $5,000,000, exclusive of interest and costs.

9.      Venue is also proper in this judicial District under 28 U.S.C. § 1391(b)(2) in that ESA conducts business in, and a substantial part of the events giving rise to the Plaintiff's and Class Members' claims occurred in, this judicial District.

10.     This Court also has jurisdiction over this action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), because at least one Class Member is of diverse citizenship from one Defendant, there are more than 100 Class Members, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs.

## PARTIES

### I.   Plaintiff

11.     Plaintiff Latreass ("Lisa") Brittian is a resident of the State of Georgia. Plaintiff was a guest at the Extended Stay America hotel located in Norcross, Georgia from December 14, 2021 through January 11, 2022.

12.     Plaintiff extended her stay by prepaying $1,777.50 for a second reservation from January 11, 2022 through February 8, 2022.

3

13.     Plaintiff was designated a "no show" for her second reservation by the ESA computer system, was told her reservation could not be accommodated because she was a "no show" and was told to vacate the hotel room.

14.     Although the Extended Stay America hotel denied Plaintiff accommodation at the hotel, the Extended Stay Hotel retained Plaintiff's prepaid lodging fee of $1,777.50 and refused to refund the prepaid reservation.

## II.  Defendants

### A.  ESA Defendants

15.     Defendant ESA Management, LLC ("ESA Management") is a Delaware corporation headquartered in Charlotte, North Carolina.

16.     ESA Management is a wholly owned subsidiary of ESH Hospitality, Inc.

17.     ESH Hospitality, Inc. ("ESH Hospitality") is a Delaware company with its principal place of business in North Carolina. ESH Hospitality is the largest lodging REIT in North America by unit and room count.

18.      Prior to June 2021, ESH Hospitality was a subsidiary of Extended Stay America, Inc.

19.     Extended Stay America, Inc. was acquired for $20.50 per paired share in cash in a transaction valued at approximately $6 billion through funds managed by Blackstone Real Estate Partners and Starwood Capital Group.

20.     The acquisition was completed through a merger of ESH Hospitality and Extended Stay America, Inc. on June 16, 2021.

21.     Upon completion of the transaction, Extended Stay America, Inc. was extinguished, and its stock ceased trading publicly.

4

22.     ESH Hospitality became the successor to Extended Stay America, Inc. upon completion of the transaction.

23.     Extended Stay America, Inc. was, and ESH Hospitality is, the largest integrated owner/operator of company-branded hotels in North America. Its hotels serve the mid-price extended stay segment and account for approximately 42% of the segment by number of rooms in the United States.

24.     As of December 31, 2019, Extended Stay America, Inc., which merged with ESH Hospitality, owned and operated 557 hotel properties in 40 U.S. states, consisting of approximately 61,900 rooms, and franchised or managed 73 hotel properties for third parties, consisting of approximately 7,500 rooms.

25.     All 630 system-wide hotels operate under the Extended Stay America brand.

26.     For the year ended December 31, 2019, Extended Stay America, which merged with ESH Hospitality, had total revenues of $1,218.2 million, net income of $165.1 million and Adjusted EBITDA of $535.0 million.

27.     During the year ended December 31, 2019, 52.8% of Extended Stay America, Inc.'s franchise and management fees and related revenues were derived from franchising activities and 47.2% were derived from management activities.

28.     ESH Hospitality's franchisees typically pay an initial application fee, along with monthly royalty and system services fees for the licensing of our brand and the use of our shared system-wide platforms, such as marketing, technology infrastructure, central reservations, national sales and revenue management systems.

29.     The standard term for ESH Hospitality's franchise agreements is generally 20 years.

5

30. ESH Hospitality competes with other lodging brands and products for potential franchisees.

31. Franchisees choose franchise systems based on a variety of reasons, including potential returns on investment, brand name recognition and reputation, brand standard requirements, franchisors' ability and willingness to invest capital, fees and other contract terms, availability of suitable hotels in certain geographic areas, sales support, marketing support, reservations systems, information technology systems, operational support, purchasing programs and other support systems.

32.

33. Defendant ESA Management is an extended stay hotel management company in the U.S. with more than 7,000 associates providing services at more than 555 Extended Stay America branded hotels in 40 states.

34. Defendant ESH Hospitality Strategies LLC ("ESH Strategies") is a Delaware corporation with its principal place of business in Charlotte, North Carolina.

35. ESH Strategies is a wholly owned subsidiary of ESH Hospitality, Inc.

36. ESH Strategies owns the Extended Stay America brand and licenses the brand and intellectual property to its subsidiaries, ESH Strategies Branding LLC and ESH Strategies Franchise LLC.

37. Defendant ESH Strategies Franchise LLC is a Delaware company with its principal place of business in Charlotte, North Carolina.

38. ESH Strategies Franchise LLC is a wholly owned subsidiary of ESH Strategies.

39.     ESH Strategies Franchise LLC licenses the Extended Stay America brand name from ESH Hospitality Strategies LLC and in turn relicenses it to Operating Lessees and third-party franchises.

40.     Defendant ESH Strategies Branding LLC is a Delaware company with its principal place of business in Spartanburg, South Carolina.

41.     ESH Strategies Branding LLC is a wholly owned subsidiary of ESH Strategies.

42.     ESH Strategies Branding LLC licenses the Extended Stay America intellectual property and in turn relicenses it to the Operating Lessees and third-party franchises.

43.     Defendants Doe Companies 1-10 are necessary parties because the Agreement (Ex. 1) states that it is between the consumer and "ESH Strategies Branding LLC and its affiliates, subsidiaries and related companies." The "affiliates, subsidiaries and related companies" are unnamed and therefore yet to be identified.

44.     Defendants ESA Management, LLC; ESH Hospitality Strategies LLC; ESH Strategies Franchise LLC; ESH Strategies Branding LLC; and Doe Companies 1-10 are referred to collectively herein as "ESA" or "Extended Stay America."

**B. TWC Defendants**

45.     Defendant Three Wall Capital, LLC is a New York limited liability company headquartered in New York, New York. Three Wall Capital, LLC is a hospitality equity and debt investment group for institutional and individual investors.

46.     Three Wall Capital, LLC has completed over $2 billion in transactions in a principal investor capacity since inception.

47.     Three Wall Capital, LLC owns portfolios of extended stay hotels, including Extended Stay America Atlanta - Norcross, Georgia; Extended Stay America Virginia Beach, Virginia; Extended Stay America Newport News, Virginia; Extended Stay America Richmond –

7

Glen Allen – Short Plump, Virginia; Extended Stay America Chantilly – Dulles, Chantilly, Virginia; Extended Stay America Atlanta – Northlake, Georgia; Extended Stay America Chicago – Elgin – West Dundee, Illinois.

48.     Defendant Aimbridge Hospitality, LLC is a Texas corporation headquartered in Dallas, Texas. Aimbridge Hospitality provides hotel management services, accounting, revenue management, and various other hotel management related services.

49.     Aimbridge Hospitality currently manages approximately 800 hotels, including Defendant Three Wall Capital LLC's Extended Stay America-brand hotels.

50.     Defendant TWC Norcross LLC d/b/a Extended Stay America Suites Norcross is a Delaware limited liability company authorized to transact business in the State of Georgia and operates an Extended Stay America hotel in Norcross, Georgia.

51.     Defendants Three Wall Capital, LLC, Aimbridge Hospitality, LLC, and TWC Norcross LLC d/b/a Extended Stay America Suites Norcross are referred to collectively here in as "TWC."

## FACTUAL BACKGROUND

**I.     The Extended Stay Hotel Industry**

52.     ESA operates in the extended-stay segment of the lodging industry. ESA's sources of competition include other extended stay hotel brands, transient-oriented hotel brands that compete for both transient and extended stay guests and alternative lodging (including serviced apartments and private homes and rooms and apartments rented on the internet, also referred to as "peer-to-peer inventory sources"), according to historical filings ESA has made with the U.S. Securities and Exchange Commission.

53.     During the year ended December 31, 2019, ESA derived the greatest amount of revenue from guests who stayed thirty nights or more:

8

| Number of Nights | Percentage of Revenue |
|---|---|
| 1-6 nights | 37.7% |
| 7-29 nights | 20.7% |
| 30+ nights | 41.6% |

54.     According to ESA's historical filings with the U.S. Securities and Exchange Commission: "Extended Stay America-branded hotels are designed to provide an affordable and attractive alternative to traditional lodging or apartment accommodations and are targeted toward self-sufficient, value-conscious guests who need lodging for more than a week. Guests include business travelers, leisure travelers, professionals on temporary work or training assignments, persons relocating, the temporarily displaced, those purchasing a home and anyone else in need of temporary housing."

55.     ESA's CEO, Bruce Haase, explained at a virtual industry conference in September of 2020 that ESA's "business travelers aren't what the industry thinks of as business travelers." …. "They are folks that need to be physically present to do their job. They can't get on a Zoom meeting." Or people lost a house, Haase added. "They've been in some sort of life transition that requires them to have temporary housing." As Haase explained at the conference, "we leaned in pretty hard early on to some of the more longer-term, lower-rated business to fill up our hotels. We call that sort of our residential bucket." *When No Landlord Will Rent to You, Where Do You Go?*, NEW YORK TIMES (May 20, 2021).

56.     It is an "open secret" that many ESA guests live permanently in ESA hotel rooms:

> Early in the pandemic, as thousands of midrange and upscale hotels closed their doors, Extended Stay America, a Charlotte-based chain with 652 locations in 44 states, kept all its properties open, proving the strength of its model — and making clear what had been an open secret: People were living permanently in some of its rooms. Founded in 1995, the publicly held company has experienced industry-defying prosperity during the pandemic: $96 million in profits on revenues of $1 billion in 2020. In March, the Blackstone Group, the private-

9

equity giant, partnered with Starwood Capital Group and agreed to buy the chain for $6 billion.

*When No Landlord Will Rent to You, Where Do You Go?*, NEW YORK TIMES (May 20, 2021).

57.     Extended-stay hotels are the last housing option for low-income Americans to whom landlords will not rent, often due to prior evictions and the inability to pay the amount necessary up-front to lease housing, e.g. a security deposit and first and last months' rent. Such individuals are among the most vulnerable populations, low-income and on the verge of becoming homeless, employed at low-wage jobs and/or rely upon government assistance to meet basic needs. School children who reside in hotels are deemed homeless by school systems, qualifying them for additional assistance.

58.     Extended Stay America purports to offer lower cost accommodations by providing reduced services, including providing housekeeping and linen services less often than a typical hotel.

59.     However, Extended Stay America hotels often fail to provide any or sporadic housekeeping services or clean linens, rooms are often dirty and/or pest infested upon arrival, and the hotels can be havens for crime and prostitution.

## II.     Two Types of Reservations: Guaranteed and Prepaid

60.     An Extended Stay America guest may reserve a room in one of two ways. First a prospective guest may guarantee a room by holding the reservation with a credit card ("Guaranteed Reservation").

61.     Second, a guest may prepay for a room reservation, paying for the entire stay at the time of reservation ("Prepaid Reservation").

62.     In the case of a Guaranteed Reservation held with a credit card (and not prepaid), pursuant to the ESA Terms & Conditions, the reservation "must be cancelled by 6pm local hotel

time on the day of arrival, or the first night's stay (at quoted rate plus tax) will be charged a No Show Fee to the credit card holding the reservation." (Exhibit 1, at 1.)

63.     A Prepaid Reservation, or "advanced purchase" reservation, is non-cancellable after 24 hours after the original time of booking. Extended Stay's Terms and Conditions provide that, "[c]ancelling more than 24 hours after the original time of booking, or failing to show, will forfeit their nonrefundable advance prepayment equal to the total cost of the reservation (including tax)."

## III.    The ESA Reservation System Denies Accommodations to Guests with Prepaid Reservations and Retains the Prepaid Lodging Fees

64.     Extended Stay America hotels, both ESA-owned and franchisees, use a central reservation system to provide access to its hotel inventory through a wide variety of channels, including property-direct, a central call center, desktop and mobile websites, travel agency global distribution systems and third-party intermediaries.

65.     Franchise fees paid by franchisees includes access to shared system-wide platforms, including ESA's central reservation system.

66.     Extended Stay's reservation system conducts automated night audits and automatically deems any reservation for which a guest has not been checked-in in the reservation system on the beginning date of the reservation as a "no show."

67.     In the case of a Guaranteed Reservation, consistent with the ESA Terms & Conditions, the system charges the credit card used to hold the reservation a "No Show Fee."

68.     The reservation system also cancels the reservation.

69.     The ESA reservation system does not distinguish between a Guaranteed and a Prepaid Reservation for purposes of designating a guest a "no show."

11

70. Accordingly, if a guest who has prepaid for a room reservation is not "checked-in" to a room in the ESA reservation system by midnight on the first day of the prepaid reservation, the ESA reservation system automatically deems the reservation a "no show" and cancels the reservation.

71. The ESA reservation system does not hold the room for the duration of the prepaid reservation.

72. If a guest who has prepaid for a reservation attempts to check-in to their room after midnight of the first day of their prepaid reservation, the reservation system prohibits the guest from doing so and prompts the hotel employee to tell the guest that their reservation "cannot be accommodated."

73. ESA retains the prepaid lodging fee even though the guest is present at the hotel during the term of the Prepaid Reservation.

74. Long term Extended Stay America hotel guests may prepay for successive reservations.

75. When a guest who is already staying at an Extended Stay America hotel prepays for a subsequent reservation, if the guest is not checked-in to their subsequent reservation on the first day of the subsequent reservation, ESA's reservation system automatically deems the reservation a "no show," even though the guest is present at the hotel.

76. The ESA reservation system then cancels the reservation.

77. A guest already staying at the ESA or TWC hotel typically learns of the cancellation of their prepaid reservation in one of two ways.

78. First, the guest's key card is deactivated so that they are locked out of their room if they leave their room.

12

79. When the guest inquires at the hotel's front desk, they are told that they have been deemed a "no show" and their reservation has been cancelled, even though the guest is present at the hotel.

80. The Extended Stay reservation system does not allow staff to check the guest into the room once the reservation has been deemed a no show and the reservation has been cancelled.

81. The guest is locked out of the room without access to the guest's personal belongings, or sometimes even pets, in the room.

82. Alternatively, a guest may learn that their prepaid reservation has been cancelled when a hotel employee knocks on the door and instructs the guest to vacate the room.

83. The ESA reservation system creates a daily list of rooms that should be vacant in order for hotel employees to conduct checks to ensure that rooms that should be vacant are in fact vacant.

84. When a hotel employee finds a guest in a room which the ESA reservation system has indicated should be vacant, the guest is instructed to vacate the room.

85. If a guest refuses (because they have paid for the room), the police may be called, resulting in a trespass warning being issued against the guest or, if the guest refuses to leave at the instruction of police, the guest may be arrested, even though the guest has paid for the room in which they are found.

86. Defendants refuse to refund prepaid reservations if the reservation was deemed a no-show and cancelled by the ESA reservation system even though the guest is present at the hotel during the timing of the Prepaid Reservation.

13

87.     Extended Stay America hotel guests are often individuals without the means to obtain alternative lodging when they are denied accommodation or ordered to vacate an Extended Stay Hotel room and who can least afford to be denied a refund of their prepaid reservation.

## CHOICE OF LAW

88.     The Extended Stay America Terms & Conditions (**Exhibit 1** hereto) provide that: "These terms shall be governed in all respects by the laws of the State of North Carolina without giving effect to its conflicts of law provisions."

89.     The State of North Carolina has a significant interest in regulating the conduct of businesses operating within its borders. North Carolina seeks to protect the rights and interests of citizens of the United States against a company doing business in North Carolina.

90.     North Carolina has a greater interest in the nationwide claims of Plaintiff and members of the Nationwide Class (defined below) than any other state and is most intimately concerned with the claims and outcome of this litigation.

91.     Defendants' breaches of duty to Plaintiff and Class Members emanated from North Carolina.

92.     Application of North Carolina law to the Nationwide Class with respect to Plaintiff's and Class Members' claims is neither arbitrary nor fundamentally unfair because North Carolina has significant contacts and a significant aggregation of contacts that create a state interest in the claims of Plaintiff and the Nationwide Class.

93.     Under North Carolina's choice of law principles, which are applicable to this action, the common law of North Carolina applies to the nationwide common law claims of all Nationwide Class members.

94.     Additionally, given North Carolina's significant interest in regulating the conduct of businesses operating within its borders, the North Carolina Unfair and Deceptive Trade

14

Practices Act ("NC UDTPA") may be applied to non-resident consumer plaintiffs as against this resident-defendant.

## CLASS ACTION ALLEGATIONS

95. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff brings this action on behalf of herself and the following proposed Nationwide Class, defined as follows:

> All individuals who prepaid for a reservation at an Extended Stay America hotel in the United States, were denied accommodation at an Extended Stay America hotel during the term of the prepaid reservation, and whose prepayment was not refunded.

96. Plaintiff also brings this class action pursuant to Fed. R. Civ. P. 23(a) and (b)(3) on behalf of a proposed Georgia Subclass defined as:

> All individuals who prepaid for a reservation at an Extended Stay America hotel in the State of Georgia, were denied accommodation at an Extended Stay America hotel during the term of the prepaid reservation, and whose prepayment was not refunded.

97. Both the proposed Nationwide Class and the proposed Georgia Subclass will be collectively referred to as the Class, except where it is necessary to differentiate them.

98. Plaintiff reserves the right to amend the above definitions or to propose alternative or additional subclasses in subsequent pleadings and motions for class certification.

99. Excluded from the Class are: (a) ESA and TWC, their officers, directors and employees; their affiliates and affiliates' officers, directors and employees; their distributors and distributors' officers, directors and employees; (b) Plaintiff's Counsel; (c) judicial officers and their immediate family members and associated court staff assigned to this case; and (d) persons or entities who or which timely and properly excluded themselves from the Class.

15

100.     Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of her claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

101.     **Numerosity—Federal Rule of Civil Procedure 23(a)(1).** Plaintiff does not know the exact number of Class Members because such information is in the exclusive control of the Defendants. However, Plaintiff believes that due to the nature of the trade and commerce involved, Class Members are sufficiently numerous, most likely thousands of consumers, and geographically dispersed throughout the State of Georgia and the other states in which ESA operates, and that joinder of all Class Members is impracticable. The information as to the identity of the Class Members can be readily determined from records maintained by the Defendants, such as hotel registration records, sales records, and through public notification.

102.     **Commonality and Predominance—Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3).** This action involves common questions of law and fact that predominate over any questions affecting individual Class Members, including:

   a.   Whether the ESA reservation system and/or ESA policy and/or practice deems guests who have prepaid for a reservation, but are not checked-in in the ESA reservation system on the first day of the prepaid reservation, as a no-show;

   b.   Whether the ESA reservation system and/or ESA policy and/or practice prevents ESA and ESA-franchisee staff from checking a guess in to a prepaid reservation after the first day of the prepaid reservation;

   c.   Whether the ESA reservation system and/or ESA policy and/or practice prompts ESA and ESA-franchisee staff to inform guests who attempt to access their prepaid room during the term of the reservation, but after the first

16

day of their prepaid reservation, that their prepaid reservation cannot be accommodated;

d.  Whether the ESA reservation system and/or ESA policy and/or practice prevents ESA and ESA-franchisee staff from refunding prepaid reservations that are not accommodated;

e.  Whether the ESA keycard system deactivates guest room cards when the guest's prepaid reservation is deemed a no-show even though the guest is present at the hotel, thereby locking guests out of their rooms;

f.  Whether the ESA reservation system indicates to ESA and ESA franchisee staff that a room reserved pursuant to a prepaid reservation should be vacant when the guest is not checked-in to their prepaid reservation on the first day of the reservation; and

g.  Whether, as a result of the ESA reservation system indicating that a room should be vacant when the guest is not checked-in to their prepaid reservation the first day of the reservation, ESA and ESA franchisee staff instruct guests to vacate their room even though the guest has prepaid for the room;

h.  Whether ESA policy and/or practice is to call law enforcement when a guest who has prepaid for a room objects to vacating the room because they have prepaid for the room;

i.  Whether Defendants engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff individually and on behalf of Class Members;

j.   Whether similar or identical statutory and common law violations, business practices, and injuries are involved; and

k.   Whether individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action.

103.   **Typicality—Federal Rule of Civil Procedure 23(a)(3).** Plaintiff's claims are typical of the claims of Class Members because, among other things, Plaintiff and Class Members were injured through the substantially uniform misconduct described above. Plaintiff is advancing the same claims and legal theories on her own behalf and on the behalf of Class Members, and no defense is available to Defendants that is unique to Plaintiff.

104.   **Adequacy of Representation—Federal Rule of Civil Procedure 23(a)(4).** Plaintiff is an adequate representative of the Class because her interests do not conflict with the interests of Class Members. Additionally, Plaintiff has retained counsel competent and experienced in complex class action litigation. Thus, the Class's interests will be fairly and adequately protected by Plaintiff and his counsel.

105.   **Superiority—Federal Rule of Civil Procedure 23(b)(3).** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this matter as a class action. The damages, harm, or other financial detriment suffered individually by Plaintiff and Class Members are relatively small compared to the burden and expense that would be required to litigate their claims on an individual basis against Defendants, making it impracticable for Class Members to individually seek redress for Defendants' wrongful conduct. Even if Class Members could afford individual litigation, the court system should not be forced to shoulder such inefficiency. Individualized litigation would create a potential for inconsistent or contradictory judgments and

increase the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

## CAUSES OF ACTION

### COUNT I: BREACH OF CONTRACT
### (on behalf of the Nationwide Class Against All Defendants)

106. Plaintiff repeats, realleges and incorporates by reference the preceding paragraphs in their entirety as if fully set forth herein.

107. Plaintiff brings this action on behalf of the Nationwide Class against all Defendants.

108. Plaintiff and members of the class entered into an agreement with Defendants to provide lodging in exchange for lodging fees ("Agreement").

109. A true and accurate copy of the Agreement is attached hereto as **Exhibit 1**.

110. Plaintiff and members of the class fulfilled their end of the bargain by paying lodging fees to Defendants.

111. Defendants breached the contract with Plaintiff and members of the class by denying Plaintiff and members of the class lodging accommodation at an Extended Stay America hotel.

112. Defendants have retained lodging fees paid by Plaintiff and members of the class without providing Plaintiff and members of the class the benefit of their bargain.

113. Plaintiff and members of the class have suffered damages as a direct and proximate result of Defendants' breach, including but not limited to being deprived of lodging accommodation at an Extended Stay America hotel.

114. As a direct and proximate result of Defendants' breach, Plaintiff and members of the class are legally and equitably entitled to damages, to be decided by the trier of fact in this action.

## COUNT II: UNJUST ENRICHMENT
### (On behalf of the Nationwide Class Against All Defendants)
### (Pleading in the alternative)

115. Plaintiff repeats, realleges and incorporates by reference the preceding paragraphs in their entirety as if fully set forth herein.

116. Plaintiff brings this action on behalf of the Nationwide Class against all Defendants.

117. Defendants have received a benefit at the expense of Plaintiff and members of the class to which Defendants are not entitled.

118. Plaintiff and members of the class paid lodging fees for accommodations they never received.

119. Defendants have received and retained unjust benefits from the Plaintiff and Class Members in the form of lodging fees, even though Defendants have failed to provide the lodging accommodation for which the lodging fees were collected, making Defendants' retention unjust under the circumstances and inequity has resulted.

120. It is inequitable and unconscionable for Defendants to retain these benefits.

121. Defendants knowingly accepted the unjust benefits as a result of their conduct alleged herein.

122. As a result of Defendants' conduct, the amount of its unjust enrichment should be disgorged and returned to Plaintiff and members of the class, in an amount to be proven at trial.

## COUNT III: VIOLATION OF NORTH CAROLINA'S UNFAIR AND DECEPTIVE
### TRADE PRACTICES ACT – (N.C. Gen. Stat. §§ 71-1.1, *et seq.*)
### (On behalf of the Nationwide Class
### Against All Defendants)

20

123. Plaintiff repeats, realleges and incorporates by reference the preceding paragraphs in their entirety as if fully set forth herein.

124. Plaintiff brings this action on behalf of the Nationwide Class against all Defendants.

125. Plaintiff and members of the class are persons under the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. §§ 71-1.1, *et seq* ("NC UDTPA").

126. Defendants acts and practices complained of herein were performed in the course of Defendants' trade or business and thus occurred in or affected "commerce," as defined in N.C. Gen. Stat. §75-1.1(b).

127. The NC UDTPA makes unlawful "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce[.]"

128. The NC UDTPA provides a private right of action for any person injured "by reason of any act or thing done by any other person, firm or corporation in violation of" the NC UDTPA. N.C. Gen. Stat. § 75-16.

129. In the course of Defendants' business, Defendants intentionally or negligently concealed and suppressed material facts concerning the true nature of a prepaid hotel reservations.

130. Defendants accomplished this by collecting lodging fees for prepaid hotel reservations, denying Plaintiff and members of the class lodging accommodations at an Extended Stay America hotel during the term of the prepaid reservation, and failing to refund the prepaid lodging fees.

131. Defendants thus violated the provisions of the NC UDTPA, at a minimum by: (1) collecting lodging fees for lodging accommodations; (2) representing that the guest prepaying for a reservation would be accommodated at an Extended Stay America hotel during the term of the prepaid reservation; (3) denying guests who prepaid for a reservation accommodations at an

21

Extended Stay America hotel during the term of the prepaid reservation; and (4) failing to refund prepaid reservations when Defendants denied Plaintiff and members of the class lodging accommodations at an Extended Stay Hotel during the term of the prepaid reservation.

132. Defendants engaged in substantial aggravating factors of misleading, false, unfair or deceptive acts or practices that violated the NC UDTPA which include, but are not limited to: collecting from Plaintiff and members of the class prepaid lodging fees for reservations, failing to disclose that if Plaintiff and members of the class were not checked-in on the first day of the prepaid reservation term the prepaid reservation would be cancelled and Plaintiff and members of the class would be denied lodging accommodations at an Extended Stay America hotel during the term of the reservation for which Plaintiff and members of the class had prepaid, and failing to refund the prepaid lodging fee when denying Plaintiff and members of the class lodging accommodations.

133. Defendants intentionally and knowingly misrepresented material facts regarding the hotel room stays with intent to mislead Plaintiff and the Class.

134. Defendants' intentional omissions and misrepresentations are substantial aggravating factors of Plaintiff's and the Class Members' injuries.

135. Defendants knew or should have known that their conduct violated the NC UDTPA.

136. Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff, about the true nature of the prepaid lodging reservations.

137. Plaintiff and the Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and its concealment of and failure to disclose material information. Plaintiff and the Class would not have opted to prepay for a

reservation at an Extended Stay America hotel had Defendants disclosed the true nature of their practices.

138.    Defendants had an ongoing duty to all consumers to refrain from unfair and deceptive practices under the NC UDTPA.

139.    As a result of the foregoing wrongful conduct of Defendants, Plaintiff and members of the class have been damaged in an amount to be proven at trial, and seek all just and proper remedies, including but not limited to treble damages, an order enjoining Defendants' deceptive and unfair conduct, court costs and reasonable attorneys' fees, and any other just and proper relief available under N.C. Gen. Stat. § 75-16.

### COUNT IV: VIOLATION OF GEORGIA'S UNIFORM DECEPTIVE TRADE PRACTICES ACT – (Ga. Code Ann. § 10-1-370, *et seq.*) (On behalf of the Georgia Subclass Against All Defendants)

140.    Plaintiff repeats, realleges and incorporates by reference the preceding paragraphs in their entirety as if fully set forth herein.

141.    This claim is brought only on behalf of the Georgia Subclass against Defendants.

142.    Defendants, Plaintiffs, and the Georgia Subclass are "persons" within the meaning of Georgia Uniform Deceptive Trade Practices Act ("GA UDTPA"), Ga. Code. Ann. § 10-1-371(5).

143.    The GA UDTPA prohibits "deceptive trade practices," which include the "misrepresentation of standard or quality of goods or services," and "engaging in any other conduct which similarly creates a likelihood of confusion or of misunderstanding." Ga. Code. Ann. § 10-1-372(a).

144.    In the course of their business, Defendants intentionally or negligently concealed and suppressed material facts concerning the true nature of prepaid hotel reservations. Defendants

23

accomplished this by collecting lodging fees for prepaid hotel reservations, denying Plaintiff and members of the class lodging accommodations at an Extended Stay America hotel during the term of the prepaid reservation, and failing to refund the prepaid lodging fee.

145. Defendants thus violated the Act by, at a minimum: employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of hotel rooms.

146. Defendants engaged in misleading, false, unfair or deceptive acts or practices that violated the GA UDTPA by collecting from Plaintiff and members of the class prepaid lodging fees for reservations, failing to disclose that if Plaintiff and members of the class were not checked-in on the first day of the prepaid reservation term the prepaid reservation would be cancelled and Plaintiff and members of the class would be denied lodging accommodations at an Extended Stay America hotel during the term of the reservation for which Plaintiff and members of the class had prepaid, and failing to refund the prepaid lodging fee when denying Plaintiff and members of the class lodging accommodations.

147. Defendants intentionally or knowingly misrepresented material facts regarding the prepaid hotel reservations with intent to mislead Plaintiff and the Georgia Class.

148. Defendants knew or should have known that their conduct violated the GA UDTPA.

149. Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff, about the true nature of the prepaid hotel reservations.

150.     Plaintiff and the Georgia Subclass suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and its concealment of and failure to disclose material information. Plaintiff and the Georgia Subclass would not have opted to make prepaid hotel reservations at an Extended Stay America hotel had Defendants disclosed the true nature of their practices.

151.     Defendants had an ongoing duty to all consumers to refrain from unfair and deceptive practices under the GA UDTPA.

152.     As a direct and proximate result of Defendants' violations of the GA UDTPA, Plaintiff and the Georgia Subclass have suffered injury-in-fact and/or actual damages.

153.     Plaintiff, individually and on behalf of all members of the general public has been, or may be, subjected to Defendants' unlawful and deceptive business acts and practices and are entitled to declaratory and preliminary and permanent injunctive relief prohibiting such practices in the future, and other orders as may be necessary to restore to any person in interest, any money or property, real or personal, which Defendants acquired by means of such unlawful, unfair and deceptive business practices.

154.     In addition, Plaintiff and the Class are entitled to recover reasonable attorneys' fees, costs, and expenses incurred in bringing this action.

## COUNT V: VIOLATION OF GEORGIA'S FAIR BUSINESS PRACTICES ACT – (Ga. Code Ann. § 10-1-391, *et seq.*)

(On behalf of the Georgia Subclass
Against All Defendants)

155.     Plaintiff repeats, realleges and incorporates by reference the preceding paragraphs in their entirety as if fully set forth herein.

156.     This claim is brought only on behalf of the Georgia Subclass against Defendants.

25

157.    The Georgia Fair Business Practices Act ("GA FBPA") declares "[u]nfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce" to be unlawful, Ga. Code Ann. § 10-1-393(a), including but not limited to "representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have," "[r]epresenting that goods or services are of a particular standard, quality, or grade … if they are of another," and "[a]dvertising goods or services with intent not to sell them as advertised," Ga. Code Ann. § 10-1-393(b).

158.    The GA FBPA provides that "[a]ny person who suffers injury or damages as a result of . . . consumer acts or practices in violation of [the FBPA] . . . may bring an action." Ga. Code. Ann. § 10-1- 399(a). The statute defines "person" to mean a "natural person, corporation, trust, partnership . . . or any other legal entity." Plaintiff and members of the class are "persons" within the meaning of the Georgia FBPA. Ga. Code Ann. § 10-1-399(a).

159.    The GA FBPA defines "consumer transactions" as "the sale, purchase, lease, or rental of goods, services, or property, real or personal, primarily for personal, family, or household purposes." Ga. Code Ann. § 10-1-392(a)(10). Defendants engage in "consumer transactions" by selling prepaid hotel lodging to Plaintiff and members of the class.

160.    Defendants engaged in misleading, false, unfair, or deceptive acts or practices that violated the GA FBPA by, among other things: collecting from Plaintiff and members of the class prepaid lodging fees for reservations, failing to disclose that if Plaintiff and members of the class were not checked-in on the first day of the prepaid reservation term the prepaid reservation would be cancelled and Plaintiff and members of the class would be denied lodging accommodations at an Extended Stay America hotel during the term of the reservation for which Plaintiff and members

26

of the class had prepaid, and failing to refund the prepaid lodging fee when denying Plaintiff and members of the class lodging accommodations.

161.     As discussed herein, Defendants sold services in violation of the GA FBPA by using unfair and unconscionable means, including false representations.

162.     Accordingly, the acts and practices complained of herein constitute unfair business practices because these acts and practices are patently unfair, substantially injurious to the general public, and offensive to public policy.

163.     Plaintiff is entitled under the GA FBPA to enjoin these acts and practices by Defendants.

164.     As a result of the foregoing, Plaintiff and the Georgia Class are entitled to compensatory and statutory damages, including three times actual damages, injunctive relief, as well as their reasonable attorneys' fees and costs.

165.     Pursuant to the GA FBPA, Plaintiff, individually and on behalf of all members of the general public has been, or may be, subjected to Defendants' unlawful and fraudulent business acts and practices are entitled to declaratory and preliminary and permanent injunctive relief prohibiting such practices in the future, and other orders as may be necessary to restore to any person in interest, any money or property, real or personal, which Defendants acquired by means of such unlawful, unfair and fraudulent business practices.

166.     In addition, Plaintiff and the Class are entitled to recover reasonable attorneys' fees, costs, and expenses incurred in bringing this action.

167.     Plaintiff delivered written demand for relief, identifying the claimant and reasonably describing the unfair or deceptive act or practices relied upon and injury suffered, to

27

the ESA Defendants on or about January 27, 2022 and the TWC Defendants on or about April 11, 2022.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff and the Class pray for relief as set forth below.

a. An order certifying this action as a class action under Fed. R. Civ. P. 23, defining the Class as requested herein, appointing the undersigned as Class counsel, and finding that Plaintiff is a proper representative of the Class requested herein;

b. An order requiring Defendants to pay the costs involved in notifying Class Members about the judgment and administering the claims process;

c. Compensatory and general damages according to proof;

d. Special damages according to proof;

e. Restitution and disgorgement according to proof;

f. Injunctive relief against Defendants to prevent future wrongful conduct;

g. Prejudgment interest at the maximum legal rate;

h. Costs of the proceedings herein;

i. Reasonable attorneys' fees; and

j. All such other and further relief as the Court deems just.

## JURY TRIAL DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury on all claims in this Class Action Complaint so triable.

Dated: February 3, 2022.　　　　　　　　　Respectfully Submitted,

　　　　　　　　　　　　　　　　　　　　MILBERG COLEMAN BRYSON
　　　　　　　　　　　　　　　　　　　　PHILLIPS GROSSMAN, PLLC

28

_s/ Scott C. Harris_____
Scott C. Harris NC Bar No.: 35328
900 W. Morgan Street
Raleigh, North Carolina 27603
Tel. (919) 600-5000
Facsimile: (919)600-5035
sharris@milberg.com

James M. Evangelista (*pro hac vice*)
Kristi Stahnke McGregor (*pro hac vice*)
EVANGELISTA WORLEY, LLC
500 Sugar Mill Road
Suite 245A
Atlanta, GA 30350
Tel: (404) 205-8400
Facsimile: (404) 205-8395
jim@ewlawllc.com
kristi@ewlawllc.com

***Counsel for Plaintiff and the Proposed Class***

29