# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| LATREASS ("LISA") BRITTIAN, individually, and on behalf of all others similarly situated, | Civil Action No. 3:22-cv-00663 |
| Plaintiff, | |
| v. | |
| ESH HOSPITALITY, INC.; ESA MANAGEMENT, LLC; ESH HOSPITALITY STRATEGIES LLC; ESH STRATEGIES FRANCHISE LLC; ESH STRATEGIES BRANDING LLC; DOE COMPANIES 1-10; TWC NORCROSS LLC D/B/A EXTENDED STAY AMERICA SUITES NORCROSS; THREE WALL CAPITAL, LLC; and AIMBRIDGE HOSPITALITY, LLC, | **JURY TRIAL DEMANDED** |
| Defendants. | |

## FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiff Latreass ("Lisa") Brittian, by and through her undersigned counsel, brings this action against Defendants ESA Hospitality, Inc.; ESA Management, LLC; ESH Hospitality Strategies LLC; ESH Strategies Franchise LLC; ESH Strategies Branding LLC; Doe Companies 1-10; TWC Norcross LLC d/b/a Extended Stay America Suites Norcross; Three Wall Capital, LLC; and Aimbridge Hospitality, LLC (collectively, "Defendants"). Upon personal knowledge of the facts pertaining to herself and on information and belief as to all other matters, Plaintiff alleges as follows:

## NATURE OF THE CASE

1.      Plaintiff brings this class action on behalf of herself and all other similarly situated individuals who paid for accommodations at an Extended Stay America hotel, were denied all or

1

part of their accommodation at an Extended Stay America hotel because they had been placed on a "Do Not Rent" list, and whose payment was not refunded in its entirety or on a prorated basis.

2. Extended Stay America hotels have a systematic policy and practice across both the company-owned and franchises of maintaining a nationwide "Do Not Rent" ("DNR") list through which they deny accommodation to guests.

3. If a guest is on the DNR list attempts to check in, their accommodation will be denied. If the guest prepaid for the reservation, they do not receive a refund for the denied accommodation.

4. If a guest is denied accommodation for part of their stay after checking in and paying for the accommodation, the guest is denied a prorated refund for the portion of the stay for which they were denied accommodation.

5. Extended Stay America hotels have a policy and practice of not disclosing the existence of the DNR list or a guest's placement on the DNR list to the guest.

6. Once an individual is placed on the DNR list, if the guest attempts to check in, the Extended Stay America reservation and/or property management system instructs hotel staff not to disclose to the guest that they have been placed on the DNR list.

7. The Extended Stay America Terms and Conditions do not disclose: (1) the existence of the DNR list to prospective guests, (2) that a guest on the DNR list may prepay for a reservation, be denied accommodation, and the hotel will keep they prepayment, or (3) that the guest may be asked to leave the hotel during their stay and/or placed on the DNR list and their payment or a prorated portion thereof will not be refunded.

## JURISDICTION AND VENUE

8. The Extended Stay America Terms & Conditions include a choice of forum clause, providing: "Both parties submit to the personal jurisdiction of and venue in the state and federal

2

courts in the State of North Carolina located in Charlotte, Mecklenburg County, North Carolina. The parties further agree that any cause of action arising under these terms shall exclusively be brought in such courts." Accordingly, Defendants have agreed to submit to personal jurisdiction and venue in this Court.

9.     Attached as **Exhibit 1** is a true and accurate copy of the Extended Stay America Terms & Conditions that were applicable at all relevant times.

10.     The Court also has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1332(d), because: (a) this action is brought as a proposed class action under Fed. R. Civ. P. 23; (b) the proposed Class includes more than 100 members; (c) Plaintiff and Class Members are citizens of states that are diverse from Defendants' domicile; and (d) the matter in controversy exceeds $5,000,000, exclusive of interest and costs.

11.     Venue is also proper in this judicial District under 28 U.S.C. § 1391(b)(2) in that ESA conducts business in, and a substantial part of the events giving rise to the Plaintiff's and Class Members' claims occurred in, this judicial District.

12.     This Court also has jurisdiction over this action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), because at least one Class Member is of diverse citizenship from one Defendant, there are more than 100 Class Members, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs.

**PARTIES**

**I.     Plaintiff**

13.     Plaintiff **Latreass ("Lisa") Brittian** is a resident of the State of Georgia. Plaintiff was a guest at the Extended Stay America hotel located in Norcross, Georgia from December 14, 2021 through January 11, 2022.

3

14.     Upon checking in to the Extended Stay America hotel located in Norcross, Georgia, Plaintiff found the hotel room in poor condition, including the room being unclean and finding roaches in the room. The hotel failed to provide housekeeping for 20 days despite advertising weekly housekeeping service, failed to provide linen service for 14 days, and lacked heat for 14 days. Guests were being loud and yelling in the hallways and smoking in the Hotel despite the Hotel advertised as smoking free.

15.     Plaintiff complained to hotel staff and the general manager regarding the issues summarized in the paragraph above. The general manager told Plaintiff that the hotel was understaffed, and he was attempting to remedy the issues. As compensation, the general manager offered to refund to Plaintiff $411.36.

16.     Plaintiff extended her stay by prepaying $1,777.50 for a second reservation from January 11, 2022 through February 8, 2022.

17.     On the morning of January 11, 2022, Plaintiff attempted to check in to her second reservation at the hotel front desk by presenting her driver's license and credit card. The hotel manager informed Plaintiff that he had not processed the promised partial refund he had promised to Plaintiff's first reservation. Plaintiff and the manager discussed the failure to provide the promised refund. Plaintiff was given new key cards and she returned to her room. They key cards did not work so Plaintiff returned to the front desk and a staff member assisted her with accessing her room.

18.     Unbeknownst to Plaintiff, she was not actually checked in to her second reservation on the morning of January 11, 2022.

19.     Further unbeknownst to Plaintiff, the hotel manager placed Plaintiff on the "Do Not Rent" list the afternoon of January 11, 2022

4

20.     Plaintiff was designated a "no show" for her second reservation by the ESA computer system.

21.     When Plaintiff and her guest were locked out of their hotel room the following day, January 12, 2022, and attempted to obtain new key cards from the front desk, Plaintiff was first told her room had not been paid for and then told her reservation could not be accommodated because she was a "no show."

22.     When hotel staff pulled up Plaintiff's reservation in the property management system, a message appeared that only staff could see stating that the reservation could not be accommodated because the guest had been placed on the "Do Not Rent" list and instructed staff not to disclose to the guest that they had been placed on the "Do Not Rent" list.

23.     At no time did hotel staff ever inform Plaintiff that she had been placed on a "Do Not Rent" list.

24.     Plaintiff requested a refund for her prepaid reservation and was told she would not be given a refund because her prepaid reservation was nonrefundable.

25.     Plaintiff also did not receive a refund of the $100 cash deposit she had paid for incidentals.

26.     Hotel staff would not allow Plaintiff access to the hotel room to retrieve her personal belongings from the room.

27.     Plaintiff called the county sheriff's office to the hotel to report a theft of the $1,777.50 she had prepaid for accommodations and request that the sheriff's deputy order hotel staff to allow Plaintiff access to the hotel room to retrieve her personal belongings.

28.     After abiding by the sheriff's deputy's instruction to allow Plaintiff access to the hotel room to retrieve her personal belongings, the Extended Stay America hotel staff requested

5

that the sheriff deputy issue a trespass warning to Plaintiff. When Plaintiff asked the deputy why she was being issued a trespass warning, the deputy explained to Plaintiff that law enforcement has no choice but to issue a trespass warning once a business owner requests that a trespass warning be issued.

29.     Although the Extended Stay America hotel denied Plaintiff accommodation at the hotel, the Extended Stay Hotel retained Plaintiff's prepaid lodging fee of $1,777.50 and refused to refund the prepaid reservation.

**II.     Defendants**

**A.   ESA Defendants**

30.     **ESH Hospitality, Inc.** ("ESH Hospitality") is a Delaware company with its principal place of business in North Carolina. ESH Hospitality is the largest lodging REIT in North America by unit and room count.

31.      Prior to June 2021, ESH Hospitality was a subsidiary of Extended Stay America, Inc.

32.     Extended Stay America, Inc. was acquired for $20.50 per paired share in cash in a transaction valued at approximately $6 billion through funds managed by Blackstone Real Estate Partners and Starwood Capital Group.

33.     The acquisition was completed through a merger of ESH Hospitality and Extended Stay America, Inc. on June 16, 2021.

34.     Upon completion of the transaction, Extended Stay America, Inc. was extinguished, and its stock ceased trading publicly.

35.     ESH Hospitality became the successor to Extended Stay America, Inc. upon completion of the transaction.

6

36.     As a result of the transaction, ESH Hospitality became controlled by Eagle Parent Holdings L.P. ("Eagle Parent"), a joint venture of affiliates of Blackstone Real Estate Partners IX L.P. and Starwood Distressed Opportunity Fund XII Global, L.P.

37.     As of December 31, 2019, Extended Stay America, Inc. was, and ESH Hospitality is, the largest integrated owner/operator of company-branded hotels in North America. Its hotels serve the mid-price extended stay segment and account for approximately 42% of the segment by number of rooms in the United States.

38.     As of December 31, 2019, Extended Stay America, Inc., which merged with ESH Hospitality, owned and operated 557 hotel properties in 40 U.S. states, consisting of approximately 61,900 rooms, and franchised or managed 73 hotel properties for third parties, consisting of approximately 7,500 rooms.

39.     As of December 31, 2019, all 630 system-wide hotels operated under the Extended Stay America brand.

40.     For the year ended December 31, 2019, Extended Stay America, which merged with ESH Hospitality, had total revenues of $1,218.2 million, net income of $165.1 million and Adjusted EBITDA of $535.0 million.

41.     During the year ended December 31, 2019, 52.8% of Extended Stay America, Inc.'s franchise and management fees and related revenues were derived from franchising activities and 47.2% were derived from management activities.

42.     Extended Stay America franchisees typically pay an initial application fee, along with monthly royalty and system services fees for the licensing of our brand and the use of our shared system-wide platforms, such as marketing, technology infrastructure, central reservations, national sales and revenue management systems.

7

43.     The standard term for Extended Stay America franchise agreements is generally 20 years.

44.     Extended Stay America competes with other lodging brands and products for potential franchisees.

45.     Franchisees choose franchise systems based on a variety of reasons, including potential returns on investment, brand name recognition and reputation, brand standard requirements, franchisors' ability and willingness to invest capital, fees and other contract terms, availability of suitable hotels in certain geographic areas, sales support, marketing support, reservations systems, information technology systems, operational support, purchasing programs and other support systems.

46.     Defendant **ESA Management, LLC** ("ESA Management") is a Delaware corporation headquartered in Charlotte, North Carolina.

47.     ESA Management is a subsidiary of Eagle Manager LLC and Eagle Sub Holdco LLC which are subsidiaries of Eagle Parent.

48.     Defendant ESA Management is an extended stay hotel management company in the U.S. with more than 7,000 associates providing services at more than 555 Extended Stay America branded hotels in 40 states.

49.     Defendant **ESH Hospitality Strategies LLC** ("ESH Strategies") is a Delaware corporation with its principal place of business in Charlotte, North Carolina.

50.     ESH Strategies is a subsidiary of Eagle Parent.

51.     ESH Strategies owns the Extended Stay America brand and licenses the brand and intellectual property via related entities to ESH Strategies Branding LLC and ESH Strategies Franchise LLC.

52. Defendant **ESH Strategies Franchise LLC** ("ESA Franchise") is a Delaware company with its principal place of business in Charlotte, North Carolina.

53. ESH Franchise is a wholly owned subsidiary of ESH Strategies.

54. ESH Franchise enters into franchise agreements with franchisees, granting licenses to operate Extended Stay America hotels.

55. Defendant **ESH Strategies Branding LLC** ("ESH Branding") is a Delaware limited liability company with its principal place of business in Spartanburg, South Carolina.

56. ESH Branding is a wholly owned subsidiary of ESH Strategies.

57. ESH Branding owns the Extended Stay America intellectual property, including trademarks, trade names, and internet domains.

58. ESH Branding licenses the Extended Stay America intellectual property via related parties to third-party franchisees.

59. The Extended Stay America Terms & Conditions (Ex. 1) are entered into between ESH Branding and consumers making reservations through the Extended Stay America on-line reservation system.

60. Defendants Doe Companies 1-10 are necessary parties because the Agreement (Ex. 1) states that it is between the consumer and "ESH Strategies Branding LLC and its affiliates, subsidiaries and related companies." The "affiliates, subsidiaries and related companies" are unnamed and therefore yet to be identified.

61. Defendants ESA Management, LLC; ESH Hospitality Strategies LLC; ESH Strategies Franchise LLC; ESH Strategies Branding LLC; and Doe Companies 1-10 are referred to collectively herein as "ESA," "Extended Stay," or "Extended Stay America."

9

**B. TWC Defendants**

62.     Defendant **Three Wall Capital, LLC** is a limited liability company incorporated in Delaware and headquartered in New York, New York. Three Wall Capital, LLC is a hospitality equity and debt investment group for institutional and individual investors.

63.     Three Wall Capital, LLC has completed over $2 billion in transactions in a principal investor capacity since inception.

64.     Three Wall Capital, LLC owns portfolios of extended stay hotels, including Extended Stay America Atlanta - Norcross, Georgia; Extended Stay America Virginia Beach, Virginia; Extended Stay America Newport News, Virginia; Extended Stay America Richmond – Glen Allen – Short Plump, Virginia; Extended Stay America Chantilly – Dulles, Chantilly, Virginia; Extended Stay America Atlanta – Northlake, Georgia; Extended Stay America Chicago – Elgin – West Dundee, Illinois.

65.     Defendant **Aimbridge Hospitality, LLC** ("Aimbridge Hospitality") is a limited liability company incorporated in Delaware and headquartered in Dallas, Texas. Aimbridge Hospitality provides hotel management services, accounting, revenue management, and various other hotel management related services.

66.     Aimbridge Hospitality manages approximately 800 hotels.

67.     Aimbridge Hospitality manages Defendant Three Wall Capital LLC's Extended Stay America-brand hotels.

68.     Aimbridge Hospitality manages the Extended Stay America Suites Norcross hotel.

69.     Defendant **TWC Norcross LLC d/b/a Extended Stay America Suites Norcross** is a Delaware limited liability company authorized to transact business in the State of Georgia and operates an Extended Stay America hotel in Norcross, Georgia.

10

70.     Defendants Three Wall Capital, LLC, Aimbridge Hospitality, LLC, and TWC Norcross LLC d/b/a Extended Stay America Suites Norcross are referred to collectively here in as "TWC."

**FACTUAL BACKGROUND**

I.     **The Extended Stay Hotel Industry**

71.     ESA operates in the extended-stay segment of the lodging industry. ESA's sources of competition include other extended stay hotel brands, transient-oriented hotel brands that compete for both transient and extended stay guests and alternative lodging (including serviced apartments and private homes and rooms and apartments rented on the internet, also referred to as "peer-to-peer inventory sources"), according to historical filings ESA has made with the U.S. Securities and Exchange Commission.

72.     During the year ended December 31, 2019, ESA derived the greatest amount of revenue from guests who stayed thirty nights or more:

| Number of Nights | Percentage of Revenue |
|---|---|
| 1-6 nights | 37.7% |
| 7-29 nights | 20.7% |
| 30+ nights | 41.6% |

73.     According to ESA's historical filings with the U.S. Securities and Exchange Commission: "Extended Stay America-branded hotels are designed to provide an affordable and attractive alternative to traditional lodging or apartment accommodations and are targeted toward self-sufficient, value-conscious guests who need lodging for more than a week. Guests include business travelers, leisure travelers, professionals on temporary work or training assignments, persons relocating, the temporarily displaced, those purchasing a home and anyone else in need of temporary housing."

11

74.    ESA's CEO, Bruce Haase, explained at a virtual industry conference in September of 2020 that ESA's "business travelers aren't what the industry thinks of as business travelers." …. "They are folks that need to be physically present to do their job. They can't get on a Zoom meeting." Or people lost a house, Haase added. "They've been in some sort of life transition that requires them to have temporary housing." As Haase explained at the conference, "we leaned in pretty hard early on to some of the more longer-term, lower-rated business to fill up our hotels. We call that sort of our residential bucket." *When No Landlord Will Rent to You, Where Do You Go?*, NEW YORK TIMES (May 20, 2021).

75.    It is an "open secret" that many ESA guests live permanently in ESA hotel rooms:

> Early in the pandemic, as thousands of midrange and upscale hotels closed their doors, Extended Stay America, a Charlotte-based chain with 652 locations in 44 states, kept all its properties open, proving the strength of its model — and making clear what had been an open secret: People were living permanently in some of its rooms. Founded in 1995, the publicly held company has experienced industry-defying prosperity during the pandemic: $96 million in profits on revenues of $1 billion in 2020. In March, the Blackstone Group, the private-equity giant, partnered with Starwood Capital Group and agreed to buy the chain for $6 billion.

*When No Landlord Will Rent to You, Where Do You Go?*, NEW YORK TIMES (May 20, 2021).

76.    Extended-stay hotels are the last housing option for low-income Americans to whom landlords will not rent, often due to prior evictions and the inability to pay the amount necessary up-front to lease housing, e.g. a security deposit and first and last months' rent. Such individuals are among the most vulnerable populations, low-income and on the verge of becoming homeless, employed at low-wage jobs and/or rely upon government assistance to meet basic needs. School children who reside in hotels are deemed homeless by school systems, qualifying them for additional assistance.

## II.    Extended Stay America Hotels Are Often Unclean and Fail to Provide Services as Advertised

77.    Extended Stay America purports to offer lower cost accommodations by providing reduced services, including providing housekeeping and linen services less often than a typical hotel.

78.    However, Extended Stay America hotels often fail to provide any or sporadic housekeeping services or clean linens, rooms are often dirty and/or pest infested upon arrival, and the hotels can be havens for crime and prostitution.

## III.    Extended Stay America Hotels Maintain a "Do Not Rent" List and Place Guests on This List Liberally

79.    Extended Stay America hotels, both ESA-owned and franchisees, use a central reservation system to provide access to its hotel inventory through a wide variety of channels, including property-direct, a central call center, desktop and mobile websites, travel agency global distribution systems and third-party intermediaries.

80.    Extended Stay America hotels, both ESA-owned and franchisees, also use a central property management system.

81.    Franchise fees paid by franchisees includes access to shared system-wide platforms, including ESA's central reservation system and property management system.

82.    Extended Stay America hotels maintain a nationwide "Do Not Rent" ("DNR") list through the ESA reservation and property management systems.

83.    Guests who complain about issues at Extended Stay America hotels, including poor conditions of the accommodations or about unfair business practices, can be placed on the DNR by hotel staff.

84.    According to an NBC News article titled "Hotels upgrade their 'no-stay' lists," written by a hotel industry insider about centralized Do Not Rent lists, or "blacklists," at hotels:

13

Plus, a blacklist can be subjective. What gets you kicked out of one hotel may be perfectly acceptable behavior at another. And guests have every right to complain — even repeatedly — about valid issues. Employees don't need to feel too empowered to throw out a "blacklist" threat just because they're annoyed by a demanding guest. And all it takes it one rogue employee with a bad attitude or a personal vendetta, and unaware, innocent people can end up on the blacklist for unprofessional reasons. While that type of abuse can easily be caught on a local level, it may be impossible to spot in a large database.

85.     It is the nationwide policy and practice of Extended Stay America hotels to use the DNR list to refuse accommodations to guests who complain about the poor conditions of accommodations or unfair business practices at Extended Stay America hotels.

86.     Extended Stay America does not disclose to guests that they have been placed on a DNR list.

87.     Upon information and belief, the Extended Stay America reservation system does not prevent a guest who is on the DNR list from making a reservation at an Extended Stay America hotel.

88.     Guests may make a reservation at an Extended Stay America hotel and travel to the hotel only to be denied accommodation because, unbeknownst to the guest, they are on the DNR list.

89.     There is a nationwide practice by Extended Stay America hotels to remove guests while wrongfully keeping their money.

90.     The reasons given for placement on the DNR list are unreasoned and inconsistent.

91.     Upon information and belief, when a guest is placed on a DNR list, the list applies not merely at a single Extended Stay America location, but at all others as well. Accordingly, maintenance of the DNR list is a nationwide, top-down policy and practice.

92.     Upon information and belief, Extended Stay America hotel employees are trained and/or given the discretion to retaliate against guests who complain and kick guests out of the hotel and keep their payments.

## IV.     Extended Stay America Hotels Refuse to Provide Refunds to Guests Denied Accommodations After Being Placed on the Do Not Rent List

93.     Extended Stay America hotels maintain a nationwide policy and practice of placing guests who complain, including those who prepay for reservations, on a DNR list and either deny them accommodation and not refund their prepayment in total, or revoke their accommodation mid-stay and deny a partial refund for prepayment on a pro rata basis.

94.     An Extended Stay America guest may reserve a room in one of two ways – either by guaranteeing a room by holding the reservation with a credit card ("Guaranteed Reservation") or by prepaying for a room reservation, paying for the entire stay at the time of reservation ("Prepaid Reservation"). A Prepaid Reservation, or "advanced purchase" reservation, is non-cancellable after 24 hours after the original time of booking.

95.     Upon information and belief, guests who are on the DNR list are still able to make a Prepaid Reservation through the Extended Stay reservation system. Guests also may be placed on the DNR list after making an Prepaid Reservation.

96.     If a guest who is on the DNR list attempts to check in, a notification will appear in the ESA reservation and property management systems telling the employee to tell the guest that their reservation cannot be accommodated but not to disclose to the guest that they are on a DNR list.

97.     If the guest has prepaid for the reservation, Extended Stay America hotels retain the guest's prepayment, despite denying them the accommodation for which they paid, because prepaid reservations are "nonrefundable."

15

98.     If a guest is placed on the DNR list during their stay and required to leave a hotel, Extended Stay America hotels do not provide a pro-rated refund for the share of their accommodation which they were denied.

99.     Extended Stay America does not disclose to guests that they will not receive a refund for the share of their accommodation which they are denied if they are required by the hotel to leave a hotel during their stay.

100.    Extended Stay America hotel guests are often individuals without the means to obtain alternative lodging when they are denied accommodation or ordered to vacate an Extended Stay Hotel room and who can least afford to be denied a refund of their prepaid reservation.

101.    Plaintiff and other Extended Stay America hotel guests continue to be injured by Defendants' practice. Upon information and belief, Plaintiff may remain on the nationwide "Do Not Rent" list because she complained about accommodations indefinitely. Upon information and belief, Plaintiff will continue to be denied accommodation and a full and total refund if she attempts to prepay for a reservation at an Extended Stay America hotel in the future without knowing whether she remains on the "Do Not Rent" list. Upon information and belief, Defendants will not provide Plaintiff or any prospective guest notice of the existence or their place on the "Do Not Rent" list if they attempt to make a reservation. Defendants will continue to accept Plaintiffs' and other guests' prepaid reservation, automatically charge them a prepaid lodging fee, deny them accommodation, and then keep their full prepaid lodging fee.

## CHOICE OF LAW

102.    The Extended Stay America Terms & Conditions (**Exhibit 1** hereto) provide that: "These terms shall be governed in all respects by the laws of the State of North Carolina without giving effect to its conflicts of law provisions."

16

103.     The State of North Carolina has a significant interest in regulating the conduct of businesses operating within its borders. North Carolina seeks to protect the rights and interests of citizens of the United States against a company doing business in North Carolina.

104.     North Carolina has a greater interest in the nationwide claims of Plaintiff and members of the Nationwide Class (defined below) than any other state and is most intimately concerned with the claims and outcome of this litigation.

105.     Defendants' breaches of duty to Plaintiff and Class Members emanated from North Carolina.

106.     Application of North Carolina law to the Nationwide Class with respect to Plaintiff's and Class Members' claims is neither arbitrary nor fundamentally unfair because North Carolina has significant contacts and a significant aggregation of contacts that create a state interest in the claims of Plaintiff and the Nationwide Class.

107.     Under North Carolina's choice of law principles, which are applicable to this action, the common law of North Carolina applies to the nationwide common law claims of all Nationwide Class members.

108.     Additionally, given North Carolina's significant interest in regulating the conduct of businesses operating within its borders, the North Carolina Unfair and Deceptive Trade Practices Act ("NC UDTPA") may be applied to non-resident consumer plaintiffs as against this resident-defendant.

## CLASS ACTION ALLEGATIONS

109.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff brings this action on behalf of herself and the following proposed Nationwide Class, defined as follows:

> All individuals who paid for accommodations at an Extended Stay America hotel, were denied all or part of their accommodation at an Extended Stay

17

America hotel and placed on a "Do Not Rent" list, and whose payment was not refunded in its entirety or on a prorated basis.

110.    Plaintiff also brings this class action pursuant to Fed. R. Civ. P. 23(a) and (b)(3) on behalf of a proposed Georgia Subclass defined as:

All individuals who paid for accommodations at an Extended Stay America hotel in the State of Georgia, were denied all or part of their accommodation at an Extended Stay America hotel and placed on a "Do Not Rent" list, and whose payment was not refunded in its entirety or on a prorated basis.

111.    Both the proposed Nationwide Class and the proposed Georgia Subclass will be collectively referred to as the Class, except where it is necessary to differentiate them.

112.    Plaintiff reserves the right to amend the above definitions or to propose alternative or additional subclasses in subsequent pleadings and motions for class certification.

113.    Excluded from the Class are: (a) ESA and TWC, their officers, directors and employees; their affiliates and affiliates' officers, directors and employees; their distributors and distributors' officers, directors and employees; (b) Plaintiff's Counsel; (c) judicial officers and their immediate family members and associated court staff assigned to this case; and (d) persons or entities who or which timely and properly excluded themselves from the Class.

114.    Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of her claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

115.    **Numerosity—Federal Rule of Civil Procedure 23(a)(1).** Plaintiff does not know the exact number of Class Members because such information is in the exclusive control of the Defendants. However, Plaintiff believes that due to the nature of the trade and commerce involved, Class Members are sufficiently numerous, most likely thousands of consumers, and geographically dispersed throughout the State of Georgia and the other states in which ESA operates, and that

18

joiner of all Class Members is impracticable. The information as to the identity of the Class Members can be readily determined from records maintained by the Defendants, such as hotel registration records, sales records, and through public notification.

116. **Commonality and Predominance—Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3).** This action involves common questions of law and fact that predominate over any questions affecting individual Class Members, including:

    a.   Whether ESA maintains a national "Do Not Rent" list of guests to be excluded from Extended Stay America hotels;

    b.   Whether the "Do Not Rent" list is included in the ESA reservation and/or property management systems;

    c.   Whether Defendants deny accommodation at Extended Stay America hotels for individuals included on the "Do Not Rent" list;

    d.   Whether the ESA reservation and/or property management system and/or ESA policy and/or practice prevents ESA and ESA-franchisee staff from refunding payments for reservations that are not accommodated;

    e.   Whether Defendants' policy and/or practice is to call law enforcement when a guest who has paid for a room objects to vacating the room because they have paid for the room;

    f.   Whether Defendants' policy and/or practice is to place guests on a DNR list and fail to disclose to guests that they have been placed on a DNR list;

    g.   Whether the ESA reservation system will allow a guest who has been placed on the DNR list to prepay for a reservation;

h.  Whether Defendants' policy and/or practices is to fail to give guests a total or partial, pro-rated refund when a guest is placed on a DNR list and denied accommodation for any part of a reservation for which the guest has paid;

i.  Whether Defendants engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff individually and on behalf of Class Members;

j.  Whether similar or identical statutory and common law violations, business practices, and injuries are involved; and

k.  Whether individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action.

117.  **Typicality—Federal Rule of Civil Procedure 23(a)(3).** Plaintiff's claims are typical of the claims of Class Members because, among other things, Plaintiff and Class Members were injured through the substantially uniform misconduct described above. Plaintiff is advancing the same claims and legal theories on her own behalf and on the behalf of Class Members, and no defense is available to Defendants that is unique to Plaintiff.

118.  **Adequacy of Representation—Federal Rule of Civil Procedure 23(a)(4).** Plaintiff is an adequate representative of the Class because her interests do not conflict with the interests of Class Members. Additionally, Plaintiff has retained counsel competent and experienced in complex class action litigation. Thus, the Class's interests will be fairly and adequately protected by Plaintiff and his counsel.

119.  **Superiority—Federal Rule of Civil Procedure 23(b)(3).** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this matter as a class

action. The damages, harm, or other financial detriment suffered individually by Plaintiff and Class Members are relatively small compared to the burden and expense that would be required to litigate their claims on an individual basis against Defendants, making it impracticable for Class Members to individually seek redress for Defendants' wrongful conduct. Even if Class Members could afford individual litigation, the court system should not be forced to shoulder such inefficiency. Individualized litigation would create a potential for inconsistent or contradictory judgments and increase the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

## CAUSES OF ACTION

### COUNT I: BREACH OF CONTRACT
### (on behalf of the Nationwide Class Against All Defendants)

120.    Plaintiff repeats, realleges and incorporates by reference the preceding paragraphs in their entirety as if fully set forth herein.

121.    Plaintiff brings this action on behalf of the Nationwide Class against all Defendants.

122.    Plaintiff and members of the class entered into an agreement with Defendants to provide lodging in exchange for lodging fees ("Agreement").

123.    A true and accurate copy of the Agreement is attached hereto as **Exhibit 1**.

124.    Plaintiff and members of the class fulfilled their end of the bargain by paying lodging fees to Defendants.

125.    Defendants breached the contract with Plaintiff and members of the class by denying Plaintiff and members of the class lodging accommodation at an Extended Stay America hotel.

126.     Defendants have retained lodging fees paid by Plaintiff and members of the class without providing Plaintiff and members of the class the benefit of their bargain.

127.     Plaintiff and members of the class have suffered damages as a direct and proximate result of Defendants' breach, including but not limited to being deprived of lodging accommodation at an Extended Stay America hotel.

128.     As a direct and proximate result of Defendants' breach, Plaintiff and members of the class are legally and equitably entitled to damages, to be decided by the trier of fact in this action.

**COUNT II: UNJUST ENRICHMENT**
**(On behalf of the Nationwide Class Against All Defendants)**
**(Pleading in the alternative)**

129.     Plaintiff repeats, realleges and incorporates by reference the preceding paragraphs in their entirety as if fully set forth herein.

130.     Plaintiff brings this action on behalf of the Nationwide Class against all Defendants.

131.     Defendants have received a benefit at the expense of Plaintiff and members of the class to which Defendants are not entitled.

132.     Plaintiff and members of the class paid lodging fees for accommodations they never received.

133.     Defendants have received and retained unjust benefits from the Plaintiff and Class Members in the form of lodging fees, even though Defendants have failed to provide the lodging accommodation for which the lodging fees were collected, making Defendants' retention unjust under the circumstances and inequity has resulted.

134.     It is inequitable and unconscionable for Defendants to retain these benefits.

135.     Defendants knowingly accepted the unjust benefits as a result of their conduct alleged herein.

136.     As a result of Defendants' conduct, the amount of its unjust enrichment should be disgorged and returned to Plaintiff and members of the class, in an amount to be proven at trial.

**COUNT III: VIOLATION OF NORTH CAROLINA'S UNFAIR AND DECEPTIVE TRADE PRACTICES ACT – (N.C. Gen. Stat. §§ 71-1.1, *et seq.*)**
**(On behalf of the Nationwide Class**
**Against All Defendants)**

137.     Plaintiff repeats, realleges and incorporates by reference the preceding paragraphs in their entirety as if fully set forth herein.

138.     Plaintiff brings this action on behalf of the Nationwide Class against all Defendants.

139.     Plaintiff and members of the class are persons under the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. §§ 71-1.1, *et seq* ("NC UDTPA").

140.     Defendants acts and practices complained of herein were performed in the course of Defendants' trade or business and thus occurred in or affected "commerce," as defined in N.C. Gen. Stat. §75-1.1(b).

141.     The NC UDTPA makes unlawful "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce[.]"

142.     The NC UDTPA provides a private right of action for any person injured "by reason of any act or thing done by any other person, firm or corporation in violation of" the NC UDTPA. N.C. Gen. Stat. § 75-16.

143.     In the course of Defendants' business, Defendants intentionally or negligently concealed and suppressed material facts concerning the true nature of a prepaid hotel reservations.

23

144. Defendants accomplished this by collecting lodging fees for hotel reservations, denying Plaintiff and members of the class lodging accommodations at an Extended Stay America hotel during the term of the reservation, and failing to refund the lodging fees.

145. Defendants thus violated the provisions of the NC UDTPA, at a minimum by: (1) collecting lodging fees for lodging accommodations; (2) representing that the guest paying for a reservation would be accommodated at an Extended Stay America hotel during the term of the reservation; (3) denying guests who paid for a reservation accommodations at an Extended Stay America hotel during the term of the reservation; and (4) failing to refund lodging fees when Defendants denied Plaintiff and members of the class lodging accommodations at an Extended Stay Hotel during the term of the reservation.

146. Defendants engaged in substantial aggravating factors of misleading, false, unfair or deceptive acts or practices that violated the NC UDTPA which include, but are not limited to: collecting from Plaintiff and members of the class lodging fees for reservations, failing to disclose that the hotels maintain a DNR list and Plaintiff and members of the class could be denied lodging accommodations at an Extended Stay America hotel during the term of the reservation for which Plaintiff and members of the class had paid, and failing to refund the prepaid lodging fee when denying Plaintiff and members of the class lodging accommodations.

147. Defendants intentionally and knowingly misrepresented material facts regarding the hotel room stays with intent to mislead Plaintiff and the Class.

148. Defendants' intentional omissions and misrepresentations are substantial aggravating factors of Plaintiff's and the Class Members' injuries.

149. Defendants knew or should have known that their conduct violated the NC UDTPA.

24

150.     Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff, about the true nature of the prepaid lodging reservations.

151.     Plaintiff and the Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and its concealment of and failure to disclose material information. Plaintiff and the Class would not have opted to prepay for a reservation at an Extended Stay America hotel had Defendants disclosed the true nature of their practices.

152.     Defendants had an ongoing duty to all consumers to refrain from unfair and deceptive practices under the NC UDTPA.

153.     As a result of the foregoing wrongful conduct of Defendants, Plaintiff and members of the class have been damaged in an amount to be proven at trial, and seek all just and proper remedies, including but not limited to treble damages, an order enjoining Defendants' deceptive and unfair conduct, court costs and reasonable attorneys' fees, and any other just and proper relief available under N.C. Gen. Stat. § 75-16.

**COUNT IV: VIOLATION OF GEORGIA'S FAIR BUSINESS PRACTICES ACT – (Ga. Code Ann. § 10-1-391, *et seq.*)**

**(On behalf of the Georgia Subclass
Against All Defendants)**

154.     Plaintiff repeats, realleges and incorporates by reference the preceding paragraphs in their entirety as if fully set forth herein.

155.     This claim is brought only on behalf of the Georgia Subclass against Defendants.

156.     The Georgia Fair Business Practices Act ("GA FBPA") declares "[u]nfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce" to be unlawful, Ga. Code Ann. § 10-1-393(a), including but not limited to

"representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have," "[r]epresenting that goods or services are of a particular standard, quality, or grade … if they are of another," and "[a]dvertising goods or services with intent not to sell them as advertised," Ga. Code Ann. § 10-1-393(b).

157.    The GA FBPA provides that "[a]ny person who suffers injury or damages as a result of . . . consumer acts or practices in violation of [the FBPA] . . . may bring an action." Ga. Code. Ann. § 10-1- 399(a). The statute defines "person" to mean a "natural person, corporation, trust, partnership . . . or any other legal entity." Plaintiff and members of the class are "persons" within the meaning of the Georgia FBPA. Ga. Code Ann. § 10-1-399(a).

158.    The GA FBPA defines "consumer transactions" as "the sale, purchase, lease, or rental of goods, services, or property, real or personal, primarily for personal, family, or household purposes." Ga. Code Ann. § 10-1-392(a)(10). Defendants engage in "consumer transactions" by selling prepaid hotel lodging to Plaintiff and members of the class.

159.    Defendants engaged in misleading, false, unfair, or deceptive acts or practices that violated the GA FBPA by, among other things: collecting from Plaintiff and members of the class lodging fees for reservations, failing to disclose that if Plaintiff and members of the class were not checked-in on the first day of the prepaid reservation term the prepaid reservation would be cancelled and Plaintiff and members of the class would be denied lodging accommodations at an Extended Stay America hotel during the term of the reservation for which Plaintiff and members of the class had prepaid, and failing to refund the prepaid lodging fee when denying Plaintiff and members of the class lodging accommodations.

160.    As discussed herein, Defendants sold services in violation of the GA FBPA by using unfair and unconscionable means, including false representations.

26

161.    Accordingly, the acts and practices complained of herein constitute unfair business practices because these acts and practices are patently unfair, substantially injurious to the general public, and offensive to public policy.

162.    Plaintiff is entitled under the GA FBPA to enjoin these acts and practices by Defendants.

163.    As a result of the foregoing, Plaintiff and the Georgia Class are entitled to compensatory and statutory damages, including three times actual damages, injunctive relief, as well as their reasonable attorneys' fees and costs.

164.    Pursuant to the GA FBPA, Plaintiff, individually and on behalf of all members of the general public has been, or may be, subjected to Defendants' unlawful and fraudulent business acts and practices are entitled to declaratory and preliminary and permanent injunctive relief prohibiting such practices in the future, and other orders as may be necessary to restore to any person in interest, any money or property, real or personal, which Defendants acquired by means of such unlawful, unfair and fraudulent business practices.

165.    In addition, Plaintiff and the Class are entitled to recover reasonable attorneys' fees, costs, and expenses incurred in bringing this action.

166.    Plaintiff delivered written demand for relief, identifying the claimant and reasonably describing the unfair or deceptive act or practices relied upon and injury suffered, to the ESA Defendants on or about January 27, 2022 and the TWC Defendants on or about April 11, 2022.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff and the Class pray for relief as set forth below.

    a.    An order certifying this action as a class action under Fed. R. Civ. P. 23, defining the Class as requested herein, appointing the undersigned as Class

counsel, and finding that Plaintiff is a proper representative of the Class requested herein;

b. An order requiring Defendants to pay the costs involved in notifying Class Members about the judgment and administering the claims process;

c. Compensatory and general damages according to proof;

d. Special damages according to proof;

e. Restitution and disgorgement according to proof;

f. Injunctive relief against Defendants to prevent future wrongful conduct;

g. Prejudgment interest at the maximum legal rate;

h. Costs of the proceedings herein;

i. Reasonable attorneys' fees; and

j. All such other and further relief as the Court deems just.

## JURY TRIAL DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury on all claims in this Class Action Complaint so triable.

Dated: January 12, 2024.               Respectfully Submitted,

MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC

*s/ Scott C. Harris*
Scott C. Harris NC Bar No.: 35328
900 W. Morgan Street
Raleigh, North Carolina 27603
Tel. (919) 600-5000
Facsimile: (919)600-5035
sharris@milberg.com

28

James M. Evangelista (*pro hac vice*)
EVANGELISTA WORLEY, LLC
500 Sugar Mill Road
Suite 245A
Atlanta, GA 30350
Tel: (404) 205-8400
Facsimile: (404) 205-8395
jim@ewlawllc.com

***Counsel for Plaintiff and the Proposed Class***